UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID PEPIN,

    Plaintiff,

v.

                                      Case No. 2:19-cv-42

WISCONSIN CENTRAL LTD.,            Hon. Hala Y. Jarbou

    Defendant.
_____/

## OPINION

Plaintiff David Pepin is a former employee of Defendant Wisconsin Central Ltd. ("WCL"). Asserting claims under the Federal Employer's Liability Act (FELA), 45 U.S.C. §§ 51-60, Pepin seeks damages against WCL for back injuries he allegedly suffered while employed by WCL. Before the Court is WCL's motion for summary judgment (ECF No. 165). The Court will grant the motion in part and deny it in part.

### I. BACKGROUND

Pepin began work for WCL as a laborer in 1997, working in Wisconsin. In 2003, he became a mechanic/loader for WCL at an ore dock in Escanaba, Michigan. In late 2015 or early 2016, he became a lead mechanic at that location. After the ore dock closed in April 2017, he became a trackman on a section of track in Little Lake, Michigan. (2/19/2021 Pepin Dep. 47, ECF No. 166-1.)

Pepin's complaint is based on two injuries, one occurring in February 2016 that is the basis for Count I of the complaint, and one occurring in May 2017 that is the basis for Count II.

**A. Count I: February 2016 Injury**

On February 15, 2016, while working at the ore dock, Pepin noticed that a grate on a walkway had been "lifted up somewhat," creating a trip hazard. (*Id.* at 52.) He and a co-worker,

Scott Boudreau, decided to correct it.  One of their job duties was eliminating or ameliorating unsafe conditions.  (*Id.* at 56-61.)  Pepin walked toward Boudreau to assist him with lifting the grate and then "bent slightly to get to the grate." (*Id.* at 108.)  Boudreau told him, "I got it," so Pepin "went to move out of the way and [his] back locked up." (*Id.*)  Pepin never touched the grate or moved it in any way.  Nevertheless, his back seized up, causing enough pain for him to request an ambulance, which took him to the hospital.  He missed work for a total of 12 days.

### B. Count II: May 2017 Injury

Pepin's job as a trackman was more "physically demanding" than his previous job, involving "much more physical hard labor." (5/28/2021 Pepin Dep. 74, 78, ECF No. 166-2.)  On May 5, 2017, he was working with foreman Martin Gereau.  According to Pepin, Gereau was not happy that Pepin had displaced one of Gereau's trackmen, so Gereau treated Pepin badly.  At one point, Pepin and Gereau were sitting in a truck waiting for a train to pass and Pepin reached into the back seat to grab something to eat.  Gereau scolded Pepin, telling him, "You get paid for 8 hours, you're going to work for 8 hours.  See those tie plates over there?  I want you to start throwing from over there and throw them there." (*Id.* at 134.)

Tie plates are steel plates that weigh about 18 to 20 pounds, according to Pepin.  (*Id.* at 162.)  Gereau was referring to a pile containing a mixture of salvageable plates and scrap material.  Gereau wanted Pepin to throw the plates into a different pile so that they were separated from the scrap. (*Id.* at 165.)  Pepin started doing so.  After a few minutes, Gereau told Pepin to throw them farther away from the original pile. (5/29/2021 Pepin Dep. 11, ECF No. 166-3.)  Pepin estimates that the original pile contained about 1,000 tie plates, and he moved almost all of them himself. (*Id.* at 16-17.)  Similarly, Gereau estimates that they moved 600-800 plates over the course of two days. (Gereau Dep. 131, ECF No. 166-9.)  According to Pepin, that was an unusual quantity for a

trackman to move on one job. Typically, trackmen would throw 15 to 20 plates at a time into the back of a truck to perform a repair somewhere else along the track. (5/29/2021 Pepin Dep. 15.)

Pepin never received training on how to properly throw tie plates. (Pepin Aff. ¶ 3, ECF No. 174-7.) He observed Gereau twisting his body to throw the plates with two hands, so Pepin did the same. (*Id.* ¶¶ 20-21.) Michael Anderson, a supervisor at WCL, testified in his deposition that he expected his employees to use "good general lifting techniques" while lifting tie plates repetitively, which included "[a]voiding twisting while lifting." (Anderson Dep. 56-57, ECF No. 174-5.) That expectation is set forth as a recommendation in one of WCL's employee handbooks. (*See L.I.F.E., Live Injury-Free Everyday, Safety Rules and Recommended Practices for ENGINEERING Employees* (Mar. 2005), ECF No. 174-10, PageID.1559.)

At the end of the shift that day, Pepin complained to Gereau that his back was sore. (Gereau Dep. 113.) May 5, 2017 was a Friday. By Sunday, Pepin's back was so sore that he could not walk, so he called his supervisor to tell him that he would not be able to make it to work. (5/28/2021 Pepin Dep. 180, 182.) Pepin sought treatment and was allegedly diagnosed with herniated discs in his back. He has undergone several surgeries and has not returned to work since.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the

nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### III. ANALYSIS

**A. FELA**

The FELA imposes liability on railroad companies for "damages to any person suffering injury while he is employed . . . resulting in whole or in part from the negligence" of the railway. 45 U.S.C. § 51. To present a "prima facie case" under the FELA, Pepin must prove that:

> (1) he was injured within the scope of his employment; (2) his employment was in furtherance of [WCL]'s interstate transportation business; (3) that [WCL] was negligent; and (4) that [WCL]'s negligence played some part in causing the injury for which he seeks compensation . . . .

*Van Gorder v. Grand Trunk W. RR., Inc.*, 509 F.3d 265, 269 (6th Cir. 2007).

WCL argues that Pepin cannot show the third and fourth elements: negligence and causation.

"The FELA does not define negligence, 'leaving that question to be determined . . . by the common law principles as established and applied in the federal courts.'" *Walters v. CSX Transp., Inc.*, 754 F. App'x 394, 395 (6th Cir. 2018) (quoting *Urie v. Thompson*, 337 U.S. 163, 174 (1949) (quotation marks and citation omitted)). Thus, a plaintiff must "prove the traditional common law elements of negligence; duty, breach, foreseeability, and causation." *Przybylinski v. CSX Transp. Inc.*, 292 F. App'x 485, 488 (6th Cir. 2008) (quoting *Adams v. CSX Transp., Inc.,* 899 F.2d 536, 539 (6th Cir. 1990)).

"Under FELA, a railroad has a duty to provide its employees with a reasonably safe workplace; this does not mean that a railroad has the duty to eliminate all workplace dangers, but only the 'duty of exercising reasonable care to that end.'" *Van Gorder*, 509 F.3d at 269 (quoting *Baltimore & Ohio S.W.R. Co. v. Carroll*, 280 U.S. 491, 496 (1930)). "A railroad breaches its duty

4

to its employees when it fails to use ordinary care under the circumstances to make the working environment safe." *Przybylinski*, 292 F. App'x at 489. Put another way, "a railroad breaches its duty when it knew, or by the exercise of due care should have known that prevalent standards of conduct were inadequate to protect the plaintiff and similarly situated employees." *Van Gorder*, 509 F.3d at 269-70 (quotation marks omitted).

As to causation, the wording of the FELA "is as broad as could be framed." *Urie*, 337 U.S. at 181. Thus, a "relaxed standard of causation applies." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). The test for causation is whether the employer's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506 (1957). If the railroad's negligence played any part in the injury, "the carrier is answerable in damages even if 'the extent of the [injury] or the manner in which it occurred' was not 'probable' or 'foreseeable.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 704 (2011) (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 120-21 & n.8 (1963)).

### B. Count I: February 2016 Injury

The Court agrees that WCL is entitled to summary judgment regarding the February 2016 incident when Pepin bent over slightly while walking in order to help his co-worker adjust a grate on the walkway next to the track. Apparently, the grates would sometimes become uneven due to a vibrator and ore loader that allowed ore to accumulate underneath. Pepin asserts that WCL was negligent in allowing the grate to become uneven. There is, however, no evidence supporting this assertion. Indeed, Pepin himself asserts that he and Boudreau decided to fix the grate because that was part of his training. (2/19/2021 Pepin Dep. 96.) And in his complaint, he alleges that he was "tasked" with "lifting and cleaning grates . . . in order to reduce slip and trip hazards on those grates." (Compl. ¶ 7, ECF No. 1.) In other words, correcting the grates was part of his job. He

does not explain how WCL could have been negligent in fixing a condition that employees like him were trained to fix and were actively doing so. On the contrary, his actions suggest that WCL was exercising ordinary care.

Moreover, to the extent there was a problem with the grate, Pepin acknowledged at his deposition that his workplace on that particular day was "reasonably safe" and that the tasks he was performing were "reasonably safe." (2/19/2021 Pepin Dep. 107.) Also, he expressly acknowledged the obvious, which is that there was nothing unsafe about "walking" or "bending slightly." (*Id.* at 109.) That being the case, he has not shown that WCL breached a duty to provide him with a reasonably safe working environment on February 15, 2016. Thus, he has not shown negligence. Accordingly, WCL is entitled to summary judgment in its favor on this claim.

### C. Count II: May 2017 Injury

In contrast, WCL is not entitled to summary judgment for Pepin's claim regarding his injury on May 5, 2017. According to Pepin, WCL required him to move an unreasonable number of heavy tie plates without training on safe lifting techniques, and without mechanical assistance or tools that could have alleviated the strain on his back. For instance, Pepin asserts that WCL could have given him a tie plate hook, which is a four-foot metal bar with a hook at the end, used for moving tie plates. (Pepin Aff. ¶ 5.) Pepin had used such a hook on other occasions while working for WCL. (*Id.* ¶¶ 6-7.) Similarly, Gereau had seen such hooks used by tie plate handlers, but not for sorting scrap. (Gereau Dep. 54-55, 125.) According to Pepin, it is physically easier to throw a tie plate using a tie plate hook because it does not require the handler to bend over to the ground. (Pepin Aff. ¶¶ 5, 8.)

Alternatively, Pepin asserts that WCL could have used a boom truck with a magnet to help sort the tie plates from the scrap. Pepin avers that he has seen trucks with magnets to assist with separating "the kind of scrap" he was separating on May 5, 2017. (Pepin Aff. ¶ 11.) Gereau

acknowledged that he had access to that sort of equipment if he needed it (Gereau Dep. 44); however, Gereau believed that a magnet would not have been helpful for sorting metal parts (*id.* at 128). Similarly, Pepin's co-worker, Jason Cappaert, testified that he had never seen a magnet used for sorting metal parts and did not believe a magnet would be helpful for that task because a magnet would pick up all the metal parts, including the plates and the scrap. (Cappaert Dep. 17-18, 31, ECF No. 174-6.)

Also, Pepin testified that in his experience, the operator of a boom truck with a clam shell bucket can pick up a pile of tie plates and scrap and "shake and jostle them," allowing smaller pieces of scrap to fall to the ground for an employee to pick up, alleviating the need for the employee to pick up the larger tie plates. (5/29/2019 Pepin Dep. 19-21.)

In summary, viewing the evidence in a light most favorable to Pepin, WCL required him to move an unreasonably large number of heavy tie plates by hand without training Pepin on proper lifting and throwing techniques for tie plates and without providing tools that could have alleviated the risk of back injury. Accordingly, there is a material dispute of fact about whether WCL failed to exercise its ordinary duty of care to provide Pepin with a reasonably safe working environment.

WCL responds that Pepin received adequate training through its rule book, which advises against "twisting while lifting" as well as "over-stretching, over-reaching, and over-exerting." (L.I.F.E. book, PageID.1559.) Pepin acknowledged the existence of these guidelines at his deposition. (*See* 2/19/2019 Pepin Dep. 64-65.) However, the rule book does not specifically address throwing tie plates. Moreover, Pepin's claim is not based solely on a failure to train. It is based on the specific job requirements he faced on May 5, 2017, including the requirement to move an unusually large number of heavy plates by hand.

7

WCL also contends that Pepin had the right to refuse to do work that he felt was unsafe, pursuant to his collective bargaining agreement. That right, however, does not absolve WCL of its responsibility to provide safe working conditions. Indeed, the FELA abolished the defense of assumption of risk, and prevents employers from "exempting themselves from [the] FELA through contract." *Gottshall*, 512 U.S. at 542. Thus, WCL cannot avoid liability under the FELA by delegating to its employees the responsibility to avoid unsafe conditions created by WCL.

WCL correctly states that the "physical demands of [a] job alone are insufficient to show negligence," quoting *Volner v. Union Pacific Railroad Co.*, 509 F. App'x 706, 709 (6th Cir. 2013) and citing *Tootle v. CSX Transportation, Inc.*, 746 F. Supp. 2d 1333 (S.D. Ga. 2010). But this case is not like *Volner* or *Tootle*. In *Volner*, the plaintiff provided no evidence that "his job was unreasonably dangerous, that the tools he used were inadequate, or that his workplace was not safe." *Volner*, 509 F. App'x at 709. The plaintiff simply contended that he suffered an injury while placing railroad ties. *Id.* Also, an expert opined that the plaintiff's job duties did not present an increased risk of the injury he suffered. *Id.* In contrast, Pepin testified to facts suggesting that the particular job given to him was unusually strenuous and that the tools provided were inadequate. Also, there is a plausible connection between the job he performed and back injury.

*Tootle* is distinguishable as well. In that case, the employee testified that her job required her to carry boxes of cleaning supplies and to "use her arms in an overhead position while pressure-washing locomotive engines," creating an "unreasonable risk of recurring shoulder injuries." *Tootle*, 746 F. Supp. 2d at 1337-38. But she offered no evidence that her employer knew or should have known that the manner in which she performed her job created an unreasonable risk of injury or that the particular tasks assigned to her were dangerous or unsafe. *Id.* at 1338.

The plaintiffs in *Volner* and *Tootle* were injured while performing routine tasks that the employer had no reason to believe would result in injury. In contrast, Pepin testified that throwing a large number of tie plates by hand was not part of his normal job as a trackman. (*See* 5/29/2021 Pepin Dep. 15 ("normal trackman work throwing plates would be . . . throwing 10 or 15 of them, 20 of them on the back of a truck . . . , not throwing over a thousand . . . .").) Indeed, according to Pepin, Cappaert asked Gereau at the time, "Why do you have [Pepin] doing this? This is ridiculous. We have a boom truck to do it." (5/29/2021 Pepin Dep. 17.)[1] And Gereau, who apparently threw a smaller number of tie plates than Pepin on that particular job, told Pepin at the end of the day that his back was also sore. (Gereau Dep. 113.) From these facts, a jury could infer that Pepin's assigned task that day was not reasonably safe, and that WCL knew or should have known of the danger. WCL disputes the facts in Pepin's testimony, but the Court cannot resolve factual disputes at this stage.

## IV. CONCLUSION

In conclusion, WCL is entitled to summary judgment as to Count I of the complaint but not as to Count II. Accordingly, the Court will grant WCL's motion in part and deny it in part. An order will enter consistent with this Opinion.

Dated:   September 10, 2021                           /s/ Hala Y. Jarbou
                                                      HALA Y. JARBOU
                                                      UNITED STATES DISTRICT JUDGE

---

[1] Cappaert claims that he said, "Wouldn't it be easier if you had a boom truck to do this?" and asserts that he was making a joke because a boom truck would not have been helpful. (Cappaert Dep. 17.) This testimony conflicts with Pepin's, but at this stage the Court must view the evidence in a light most favorable to Pepin.

9